# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | James B. Moran | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 4771 | **DATE** | 9/10/2001 |
| **CASE TITLE** | Beth B. etc. et al. Vs. Mark Van Clay etc. et al. | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

> Memorandum Opinion and Order

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. For the reasons above, judgment is granted in favor of defendants on all counts.

(11) ■ [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | |
| | Notices mailed by judge's staff. | |
| | Notified counsel by telephone. | |
| ✓ | Docketing to mail notices. | |
| ✓ | Mail AO 450 form. | |
| | Copy to judge/magistrate judge. | |

number of notices

**SEP 13 2001**
date docketed

docketing deputy initials

date mailed notice

| WAH | courtroom deputy's initials |
|---|---|

CO-7
FILED FOR DOCKETING
01 SEP 11 AM 8: 15

Date/time received in central Clerk's Office

mailing deputy initials

Document Number

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

BETH B. and SUSAN and TOM B., )
individually and as next friends of )
Beth B., )
     )
        Plaintiffs, )
     )
      vs. )    No. 00 C 4771
     )
MARK VAN CLAY, individually and in )
his official capacity as superintendent, )
and LAKE BLUFF SCHOOL DISTRICT )
No. 65, )
     )
        Defendants. )

DOCKETED
SEP 1 3 2001

## MEMORANDUM OPINION AND ORDER

Plaintiffs brought this action alleging defendants failed to provide Beth B. a free appropriate public education (FAPE) under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §1400 *et seq.* and requesting that this court review an administrative decision upholding the district's decision to place her in a special education program. The complaint also includes counts seeking reimbursement for the costs of Beth's private therapy and alleging discrimination under the Americans with Disabilities Act (ADA), 42 U.S.C. §12101 *et seq.*, and Section 504 of the Rehabilitation Act (Section 504), 29 U.S.C. §794. Both parties moved for summary judgment. For the reasons below, we grant judgment for defendants.

## BACKGROUND

Beth is a thirteen year old girl with Rett Syndrome. This neurodevelopmental disorder affects only one in ten thousand girls, and does not affect boys. It is characterized in the

64

American Psychological Association Diagnostic and Statistical Manual IV as a form of autism, resulting in severe to profound disabilities to motor functioning, communication and cognition. Beth's motor skills are estimated between five and seven months. She can only walk with one-on-one assistance and is largely wheelchair-bound. These limitations, combined with her inability to speak, make traditional communication and cognition tests inappropriate. Estimates of cognition based on observations by private and District experts range from one to six years. Beth primarily communicates through eye gaze, looking at or away from a person to indicate "Yes" or "No," respectively, or looking at one item or picture from among several choices. She can sometimes manipulate a switch with her hand, although her motor skills may deteriorate as the disorder progresses to its next stage.

Beth began receiving services from the North Suburban Special Education School District (the Co-op), a special educational cooperative to which Lake Bluff belongs, in 1990, at age two, and was diagnosed with Rett Syndrome in 1991. She participated in the Co-op's Early Childhood Program from 1991 through 1994. The Co-op provided Beth with a one-on-one aide, adaptive physical education, speech/language therapy, occupational therapy and physical therapy. To begin the 1994-95 school year, at her parents urging, Beth was placed in a regular kindergarten class, with a continuation of those services offered in the Early Childhood Program. The district convened a conference annually to review and update Beth's Individualized Education Program (IEP). In June 1997, at the IEP conference following Beth's second grade year, the District recommended Beth be placed in the Co-op's self-contained Educational Life Skills (ELS) program. For most of the school day Beth would be in a classroom with five to seven other students, many of whom also have forms of autism. The

special education teachers are specifically trained and experienced in dealing with students with severe cognitive and communicative disabilities.

Beth's parents rejected this placement, demanded a due process review and invoked the IDEA's "stay put" provision. 20 U.S.C. §1415(j). The impartial hearing officer (IHO), on May 26, 2000, ruled in favor of the district. Plaintiff sought review here. During the pendency of the due process hearing and these proceedings, Beth has continued in regular education, progressing with her peers through sixth grade.

## DISCUSSION

### I. Standard of Review

The IDEA brings cases to district courts in a rather uncommon procedural posture. We "shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing [our] decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. §1415(e)(2). This differs from our typical standard for reviewing administrative decisions in two major respects.

First, we have discretion whether to decide the matter solely on the administrative record or to accept additional evidence. The seminal case interpreting the "additional evidence" clause is Town of Burlington v. Department of Education for Massachusetts, 736 F.2d 773, 790-91 (1st Cir. 1984). The court recognized several reasons why a party may wish to present new evidence to the district court, including updates on the student's progress, and expert testimony which would have been unnecessary before a presumably expert hearing officer. But it warned us that

> the trial court must be careful not to allow such evidence to change the character of the hearing from one of review to a trial de novo. ... [A] court

> should weigh heavily the important concerns of not allowing a party to undercut the statutory role of the administrative expertise, the unfairness involved in one party's reserving its best evidence for trial, the reason the [evidence was not available] at the administrative hearing, and conservation of judicial resources.

*Id.* at 791, *cited with approval by* Monticello School Dist. No. 25 v. George L., 102 F.3d 895, 901-02 (7th Cir. 1996). We held a three-day evidentiary hearing, to supplement the record from a 19-day administrative hearing.

Second, we apply a unique standard of review. Our review here is more stringent than merely ensuring that the hearing officer's decision is supported by substantial evidence, but it is not completely *de novo* either. We are to give "due weight" to the hearing officer's findings. *See* Heather S. v. Wisconsin, 125 F.3d 1045, 1052 (7th Cir. 1997). But we must not "substitute [our] own notions of sound educational policy for those of the school authorities." Board of Educ. of Community Consol. Sch. Dist. 21 v. ISBE (Dist. 21), 938 F.3d 712, 715-16 (7th Cir. 1991). Hearing officers have much greater expertise in educational policies, and judges should not second-guess them. We independently evaluate the testimony and evidence, but defer to the hearing officer's determinations. *See* Heather S., 125 F.3d at 1053. Essentially this means we should not reverse the hearing officer's findings simply because we disagree with them. We also, of course, review purely legal questions *de novo*. *See* Morton Community Unit School Dist. No. 709 v. J.M., 152 F.3d 583, 588 (7th Cir. 1998).

Currently pending are the parties' cross-motions for summary judgment. There are many disputed facts and ordinarily this would preclude summary judgment. *See* Anderson v. Liberty Lobby, 477 U.S. 242, 249 (1986). But as we have described above, the standard for review in IDEA cases is unique. The district court independently reviews the administrative

record and any additional evidence it chooses to receive, and decides the merits based on the preponderance of evidence, giving "due weight" to the IHO's determinations. *See* Dist. 21, 938 F.2d at 715. Although the parties still dispute many facts, we have a 30 volume administrative record and have supplemented it with our own evidentiary hearing. This case is ripe for adjudication. Permitting a full trial on matters already in the administrative record, even disputed facts, would render that hearing a nullity, contrary to the statutory direction to give the IHO's opinion "due weight." Capistrano Unified School Dist. v. Wartenberg, 59 F.3d 884, 891-92 (9th Cir. 1995); A.P. v. McGrew, 1998 WL 808879 at *3 (N.D. Ill. Nov. 16, 1998); *but see* Doe v. Metropolitan Nashville Public Schools, 133 F.3d 384, 387 (6th Cir. 1998) (holding summary judgment inappropriate if facts are disputed). "Because this appears to be what Congress intended under the Act, we conclude it is the right thing to do, even though it does not fit well into any pigeonhole of the Federal Rules of Civil Procedure." Capistrano, 59 F.3d at 892. The IDEA does not require a full trial *de novo*. Perhaps our decision today is better described as judgment on the record, rather than summary judgment. Either way, we proceed to consider the merits.

## II. The Placement Decision

The crux of this case is the Least Restrictive Environment (LRE) requirement, 20 U.S.C. §1412(5), and how it interacts with the district's obligation to provide an FAPE. 20 U.S.C. §1412(1). The IDEA's primary purpose is to ensure that disabled children have access to educational opportunities. School districts are obligated to provide services "reasonably calculated to enable the child to receive educational benefits." Board of Educ. v. Rowley, 458 U.S. 176, 207 (1982). This does not, however, mean that the child must receive an optimal

education. *Id.* at 191-203. Nor must the district provide services allowing her to achieve at the same level as non-disabled students. *Id.*

Congress left local school authorities wide discretion as to how to achieve this mandate. Courts are not to second-guess pedagogical or educational policy decisions. But Congress did make one clear policy choice, that disabled students benefit from interaction with non-disabled peers and should do so to the maximum extent possible – the LRE requirement. 20 U.S.C. §1412(5). This does not, however, override the primary obligation to provide educational benefits. A district need not, indeed may not, place a child in a program that does not confer educational benefits simply because it is less restrictive.

Here the parties each claim that their placement is the only one that will provide Beth any benefits. Because the district's obligation to provide an FAPE is paramount, the sufficiency of the district's proposed placement is a threshold question. We must resolve this before even considering whether it is least restrictive. <u>Rowley</u>, the seminal FAPE case, defines a school district's obligations as "providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction." 458 U.S. at 203. The Court further found that the lack of concrete substantive standards within the statute was intentional. Congress meant to leave those to the states, so long as the student received some educational benefit. *Id.* at 199.

A. Educational Benefit

First, we discuss the IHO's FAPE analysis. His opinion discusses how the district made "careful and competent analysis that includes reasonable efforts to obtain relevant information needed to develop a beneficial placement." (IHO Op. at 35). Plaintiffs argue that this is a more

permissive standard than pronounced by Rowley. We disagree. Rowley explicitly recognized
that the IDEA grants school districts flexibility to deal with a wide range of disabilities. For
example, in Rowley itself, the Court found that the "instruction and services ... must
approximate the grade levels used in the State's regular education." 458 U.S. at 203. Given
Beth's limited abilities, this particular standard would clearly not be appropriate here. The
district's experts estimate her mental age as between 12 and 20 months, while plaintiffs'
experts place her between 4 and 6 years,[1] and she has a very limited ability to communicate.
She cannot possibly comprehend a normal seventh grade curriculum. Consequently, we must
use a metric other than regular education grade levels. We must also consider that the
scientific and educational communities have only a limited understanding of Rett Syndrome.
Because its incidence is so low, there have not been sufficient studies to determine, to any
degree of certainty, how to best educate students with this disorder. The IHO stated his
analysis in terms of reasonable efforts to research the disability. This makes eminent sense
under the circumstances. Where there is no consensus among educators, all a school district
can do is review the available literature and then exercise its professional judgment as to how
to best educate the student. Doing the research alone, obviously, is not adequate. The district
must still comply with all the other statutory requirements. If anything, the IHO's standard
requires more of school districts. Instead of simply developing and implementing an IEP
according to established pedagogical practices, because so little is known about Rett
Syndrome, the district had to conduct independent research prior to developing Beth's IEP.

---

[1] Age-equivalence measures can be misleading. See D.F. v. Western School Corp., 921 F.Supp. 559,
567 (S.D. Ind. 1996). This is particularly true here because Beth's limited communication skills prevent the
use of many traditional tests. The wide disparity among the experts' opinions only corroborates this. The
administrative record, including testimony from Beth's teachers, aides and therapists, however, creates a
sufficiently clear picture of her abilities.

We believe the IHO's standard is an appropriate application of the principles announced in

Rowley to a disorder such as Rett Syndrome, about which so little is known.

Having approved the IHO's legal standard, we must review his application of it to the

facts. He found that the district made sufficient attempts to learn about Rett Syndrome in

developing its IEP for Beth. We agree. As we noted above, neither the scientific nor the

educational community fully understands Rett Syndrome. The studies completed thus far

have been limited in scope and the theories they developed have not been sufficiently tested to

reach any authoritative conclusions. Given these limits, the district consulted with some of the

most knowledgeable experts available. Plaintiffs make much of the fact that the district agreed

to consult an independent expert, Dr. Joseph Vaal, in developing Beth's IEP, but then did not

follow his recommendations. The district, in fact, consulted with multiple "experts."[2] Besides

Dr. Vaal, the district also consulted with Dr. Richard Van Acker, who reached very different

conclusions. The district's special education teachers, who have experience with cognitive

disabilities in general,[3] and Beth's teachers, aides and inclusion coordinators, who have direct

experience with Beth, also participated in the process. A district is not obliged to follow any

particular one's advice. School officials do not relinquish their ultimate authority to make

educational policy decisions by agreeing to consider an independent consultant's opinion.

Plaintiffs also complain that the district was uncooperative with her private therapists. Again,

we agree with the IHO. Although ideally the district and parents will cooperate in pursuit of

---

[2] Both parties vigorously attack the opposing experts' credentials and credibility. These are all competent professionals. Their experiences with Rett Syndrome are limited, but given the paucity of research on this disorder, they are among the most knowledgeable available. We give great deference to the IHO's credibility determinations, and he found these witnesses credible.

[3] The ELS program administrator has direct experience with four girls who have Rett Syndrome, including one who is currently in the program.

the best program for the disabled child, the IDEA does not oblige the school to consult with private therapists. This does not, in and of itself, negate the reasonableness of the district's efforts. We agree with the IHO that the district acted reasonably in developing Beth's placement.

Plaintiffs also challenge the IHO's opinion on the ground that he misapplied the burden of proof. At the administrative level the school district does bear the burden to prove that its proposed IEP is adequate under the statute. *See* 105 ILCS 5/14-8.02(h). But the party challenging the administrative decision bears the burden in the district court. *See* Dist. 21, 938 F.2d at 716.[4] Throughout his opinion the IHO acknowledges uncertainties about the district's program. Plaintiffs characterize this as a finding that the evidence was a "draw," and that this, by definition, means the district failed to carry its burden. This both overstates the district's burden and reads too much into the IHO's statements. The district does not have to prove its placement is pedagogically superior to the parents. The district presented evidence that, based on the available research, its placement is likely to benefit Beth, *i.e.,* is appropriate. This satisfies its burden. That an alternative placement may also confer benefits does not negate the appropriateness of the district's placement. Plaintiffs also attempt to use the IHO's candid discussion of the conflicting evidence to attack his findings. The IHO acknowledged that the parents' experts raised valid concerns about the district's placement, and that the

---

[4] This is the general rule governing review of administrative decisions. There is some debate among the circuits about whether the burden should shift in LRE cases because of the statutory presumption for mainstreaming. The majority of circuits have said no. *See* Clyde K. v. Puyallup School Dist. No. 3, 35 F.3d 1396 (9th Cir. 1996) (collecting cases from other circuits); *but see* Oberti v. Board of Educ. of the Borough of Clementon School Dist., 995 F.2d 1204, 1218 (3d Cir. 1993) (placing burden on school district regardless of who won below). The Seventh Circuit opinions in this area have cited the general rule, without discussing the LRE question specifically. Because the burden of proof is not decisive here, we decline to definitively join either camp. *See* T.H. v. Board of Education of Palatine Community Consolidated School District No. 15, 55 F.Supp.2d 830, 835 (N.D. Ill. 1999).

district's responses were not completely satisfactory. This is not the same as saying the district's placement will not benefit the student, just that there are still questions. He explicitly stated that his uncertainty was not due to inadequate evidence from the parties, but rather the limited knowledge we have of Rett Syndrome. No one, least of all lay judges, knows with any certainty what is pedagogically best for Beth. But the IDEA does not require the district to resolve all doubts about its proposed placement. The IHO found, and we agree, that the district's placement is reasonably calculated to benefit Beth. His candor about his uncertainty does not reflect error.

## B. Least Restrictive Environment

Plaintiffs maintain that Beth should remain in regular classes at Lake Bluff Middle School because this is the least restrictive environment. But the IDEA only requires mainstreaming to the "maximum extent appropriate." 20 U.S.C. §1412(5). This language is far from absolute and invites a balancing approach. "[T]he mainstreaming requirement was developed in response to school districts which were reluctant to integrate mentally impaired children and their non-disabled peers. It was not developed to promote integration with non-disabled peers at the expense of other IDEA educational requirements." Murphysboro, 41 F.3d at 1168. The IDEA's twin goals, tailoring each child's placement to her special needs and maximizing integration with non-disabled students, are frequently difficult to reconcile, and the statute itself provides little guidance. It does recognize that there are circumstances where regular education is not appropriate. *See* 20 U.S.C. §1412(5)(B). The vexing issue is when, and to what degree, segregating a student in special education is permissible.

Again, plaintiffs attack the standard applied by the IHO, arguing that he erroneously

used <u>Rowley</u> in determining whether the district's placement satisfied the LRE requirement. Plaintiffs are correct that <u>Rowley</u> is not the proper standard for LRE analysis. In fact, however, the IHO never reached that question. He found that the parents' placement would not confer educational benefit to Beth and, therefor, could never be appropriate. Because educational benefit is paramount, and the parents' placement (in his opinion) failed this test, he did not consider whether it was less restrictive. We agree that benefit to the student is of primary importance and share many of the IHO's reservations about the parents' placement. But the district is obliged to provide a FAPE, which includes compliance with the LRE requirement, regardless of any proposal from the parents. We must review the district's placement to determine whether it is consistent with law. The statute itself does not prescribe a substantive standard for balancing educational benefits with mainstreaming, so the courts have developed their own. The circuits are split into at least three camps, and neither the Supreme Court nor the Seventh Circuit has indicated a preference among these tests.

The Sixth Circuit has focused on the feasibility of keeping the student in regular education. *See* <u>Roncker v. Walter</u>, 700 F.2d 1058 (6th Cir. 1983). Under this test the court must identify what makes the segregated placement superior, and determine whether those services can feasiblely be provided in a non-segregated setting. *Id.* at 1063. <u>Roncker</u> also identifies three scenarios when special education is proper: (1) the student will not benefit at all from mainstreaming; (2) the benefits from services that cannot feasiblely be offered in a mainstream setting may far outweigh any marginal benefits from mainstreaming; or (3) the child may disrupt other students.[5] *Id.* The Fourth and Eighth Circuits have also adopted this test. *See*

---

[5] Cost may also be a factor in some circumstances, but is not at issue here.

Devries v. Fairfax County School Bd., 882 F.2d 876, 879 (4th Cir. 1989); A.W. v. Northwest R-1 School Dist., 813 F.2d 158, 163 (8th Cir 1987).

The Fifth Circuit found that Roncker "necessitates too intrusive an inquiry into policy choices that Congress deliberately left to state and local school officials. Whether a particular service feasibly can be provided in a regular or special education setting is an administrative determination that state and local school officials are far better qualified and situated than are we to make." Daniel R.R. v. State Bd. of Educ., 874 F.2d 1036, 1046 (5th Cir. 1989). Instead, it fashioned its own test: "First we ask whether education in the regular classroom, with the use of supplemental aids and services, can be achieved satisfactorily for a given child. If it cannot ..., we ask, second, whether the school has mainstreamed the child to the maximum extent appropriate." Id. Although it emphasized that there is no fixed set of factors to consider, the court identified several that may be relevant at each stage of the inquiry. These include whether the state had taken steps to accommodate the child in regular education; whether the child will receive benefits from regular education; and what effect the handicapped child's presence has on the classroom environment. Id. at 1048-50. The Third and Eleventh Circuits have also adopted this test. See Oberti v. Board of Educ., 995 F.2d 1204, 1215 (3d Cir. 1993); Greer v. Rome City School Dist., 950 F.2d 688, 696 (11th Cir. 1991).

The Ninth Circuit has added yet another analytical framework to the mix. Its multi-factored balancing test includes elements drawn from both Roncker and Daniel R.R. See Sacramento City Unified School Dist. v. Holland, 14 F.3d 1398 (9th Cir. 1994). The court must consider "(1) the educational benefits of placement full-time in a regular class; (2) the non-academic benefits of such placement; (3) the effect [the disabled student] had on the teacher

and children in the regular class; and (4) the costs of mainstreaming [the disabled student.]" *Id.* at 1403.

The Seventh Circuit has not adopted any of these tests. *See* <u>Monticello School Dist. No. 25 v. George L.</u>, 102 F.3d 895, 905 (7th Cir. 1996) (discussing both the <u>Roncker</u> and <u>Daniel R.R.</u> tests, without endorsing either). Although it did not cite <u>Holland</u>, the <u>Monticello</u> court's analysis included many of the same factors weighed by the Ninth Circuit. Our court of appeals' most recent LRE decision deferred to the IHO's finding without discussion, and consequently did little to clarify which test applies in this jurisdiction. *See* <u>Board of Educ. of LaGrange School Dist. No. 105 v. ISBE (LaGrange)</u>, 184 F.3d 912 (7th Cir. 1999). At least one sister court within this circuit considered a <u>Holland</u>-type balancing analysis, and ultimately reconciled it with <u>Daniel R.R.</u> "The Daniel R.R. test states the standard in terms very close to the statutory terms. The Holland factors identify more specific levels of inquiry for applying the more general Daniel R.R. standard. ... The court will apply the two part test stated in Daniel R.R. and Oberti, but will organize its discussion in terms of the four Holland factors." *See* <u>D.F. v. Western School Corp.</u>, 921 F.Supp. 559, 567 (S.D. Ind. 1996).[6]

We find the <u>Daniel R.R.</u> test superior, particularly as applied in <u>D.F.</u> It tracks the statutory language more closely than does <u>Roncker</u>, and, in our opinion, strikes a better balance between the competing policies. First, we agree with the Fifth Circuit that basing a test on "feasibility" is too intrusive. Courts are poorly suited to decide what can or cannot be done effectively in a classroom. The IDEA leaves local officials discretion in implementing the statute's goals, and feasibility requires policy determinations more appropriately left to

---

[6] We note that the <u>D.F.</u> case predates <u>LaGrange</u>, but as we mentioned above, that opinion does not appear to settle on any particular test.

educators than to judges. Second, feasibility places too much emphasis on what services can be delivered and not enough on what the student actually learns. Some services may be feasible in regular education, but more effectively delivered in a special education setting. Although Congress has expressed a preference for integration, its primary goal, and our foremost consideration, is still assuring educational benefits to the child. Daniel R.R. focuses first on whether the education is satisfactory, and then on whether the child could have greater exposure to non-disabled students. This gives each its appropriate weight. We do not find anything in Holland objectionable. The factors considered are all relevant to a determination of whether the placement is both appropriate and least restrictive. But we agree with the Fifth Circuit that the factors must be case-specific. Daniel R.R. draws on the statutory language to set a general framework – a test – and then examines several factors in its application of that test. Holland utilized some of these factors, as well as some additional ones appropriate in that particular case. D.F. properly characterized these as the more specific inquiries called for by the Daniel R.R. test, and used them to organize its analysis. We shall do the same. Because the Seventh Circuit has not adopted either test, however, we will evaluate Beth's situation under Roncker as well.

### 1. The Daniel R.R. Test

We first consider whether Beth can receive a satisfactory education in a regular classroom setting. After reviewing the steps the district has taken to accommodate Beth's disability, the educational and non-educational benefits she receives, and Beth's impact on the classroom environment, we conclude she will not.

First, the district has made adequate attempts to accommodate Beth with individualized

services. Beth has two teachers' aides and an inclusion facilitator who work with her. They have developed a special curriculum for Beth to follow, focusing on the goals stated in her IEP, including special books with laminated pages, puffed-up pictures and modified text. The district also provided numerous assistive technologies for Beth, including jelly-bean switches, One Step Communicator, Step-by-Step Communicator and Intellikeys.[7] Teachers and other students have received special instruction in how to communicate with Beth. The school has also modified her schedule, such as scheduling extended bathroom breaks into her day. The IHO found that these measures constituted an adequate attempt by the district to accommodate Beth, and we agree.

Next we consider the educational benefits she will receive. There is a stark factual dispute about the level of progress Beth has made in her current placement. Plaintiffs contend she has progressed dramatically, despite inadequate services from the school. Defendants contend that she has progressed little, if not regressed, despite their herculean efforts. The IHO struggled with the conflicting evidence from Beth's teachers and private therapists, but ultimately decided it was not necessary to reconcile their differing views. Our independent review shows that Beth's progress has been inconsistent. Due to the nature of her disability, Beth's progress must be measured in fine increments and involves a large degree of subjectivity. She has shown occasional improvement in certain areas, but she has appeared to regress in others. She also does not duplicate learned skills regularly, but sporadically. This is not to diminish what she has accomplished. But we believe, at least we hope, she can learn

---

[7] These devices allow Beth to communicate preprogrammed messages in various ways, such as by activating a switch.

much more in a better setting.[8]  Moreover, we agree with the IHO that whatever benefits Beth

has received are not attributable to regular education, but from what is more accurately

described as special education within a regular classroom.

Beth has severe cognitive limitations.  At the middle school level the material in the

regular curriculum is too complex and the pace too quick for Beth to comprehend.  She will

gain no benefit from it.  The IDEA requires that the school provide sufficient supplemental

services to allow the disabled student to benefit from a regular education.  It does not,

however, require changes so extensive that the curriculum becomes unrecognizable.  Daniel

R.R., 874 F.2d at 1048.  This is what would be necessary for Beth, who is working on a

completely different skill set from her non-disabled peers.  Her IEP focuses on tasks such as

establishing eye contact with people who speak to her, responding to verbal commands within

10-15 seconds, grasping items with her hands, bringing food to her mouth with modified

utensils, choosing among objects or pictures and activating her assistive technology.  Beth

cannot recognize letters.[9]  While her peers have begun reading novels, Beth utilizes books

written at a pre-school level, with emphasis on pictures and repeated phrases.  While other

students learn about credit cards and balancing their checkbooks, Beth learns to sort food

items from clothes.

She does not participate in the class lectures and discussions, but works one-on-one

with her aide, effectively segregated from the rest of the class.  The district has designed

---

[8] We describe the proposed setting and its benefits in more detail in the section applying the Roncker test.

[9] Many experts believe girls with Rett Syndrome are incapable of grasping any symbol-based system, such as the alphabet.

exercises for Beth that are parallel to what her peers are studying. For example, when the class studied the composition of clouds, Beth looked at pictures of clouds. Beth misses a substantial portion of instructional time. Middle school students switch classrooms six or seven times per day, with three minutes allotted between periods. Transporting and setting up Beth's equipment and support items takes considerably longer. She frequently falls asleep in school, has 20-30 minute scheduled toilet breaks, and is frequently absent.[10] All these factors inhibit Beth's ability to keep pace with the class, even with her parallel curriculum. In an attempt to maintain the parallelism, when the class moves on to the next unit, so does Beth, regardless of her progress. Plaintiffs argue that the teachers' failure to integrate her into the classroom activities demonstrates the inadequacy of the district's efforts to accommodate her. Because the lessons are mostly lectures, Beth is working on a completely different skill set. There is little a teacher could do to involve Beth that would not detract from the other students.

We also consider any non-academic benefits Beth might derive from a regular education setting. Our preference for mainstreaming is based, in part, on the belief that exposure to non-disabled students allows the disabled student to model their speech and behavior. Beth's private therapists report that she does imitate some behavior models observed from her non-disabled peers. Plaintiffs maintain that Beth must remain in a language-rich environment, that she is motivated to communicate by exposure to non-disabled children and that her communication skills will regress in the ELS program, where she will

---

[10] For example, she misses one day per week to attend private therapy. She was also absent approximately 25% of the remaining days.

primarily be with other non-communicative autistic children.[11] The district's experts maintain that girls with Rett Syndrome are pre-imitative – their development is arrested at under one year, before the point at which they will imitate behavior models. We certainly agree that it is important for Beth to continue exposure to non-disabled students, but we are also mindful that it may be of limited value for imitation purposes. Moreover, we do not believe she will get that kind of contact in a regular middle school setting. As discussed above, because of the curriculum differences, Beth necessarily sits apart from the other students, working with her aide, on her own lessons. The record reflects that Beth's interaction with other students has declined as her peers have advanced grade levels. In middle school, where lectures are primarily used, there is minimal opportunity for interaction with other students during academic classes.

Lastly, we consider the effect of Beth's presence on the regular education environment. This generally falls into two categories, her effects on the other students and on the teacher. First, does the disabled student cause any disruptions in the classroom? Beth's aides must use special tones and inflections to maintain her attention, which has a tendency to distract other students. Beth also periodically makes loud vocalizations. She regularly falls asleep and has occasionally vomited in class. Because of complaints from other students and parents, Beth is often removed from the classroom when tests are administered. This is unfair to the other students in the class. Nonetheless, this problem appears to be infrequent and relatively mild, so we do not ascribe much weight to it. Second, does the student require so much attention

---

[11] Plaintiffs also argue that Beth benefits socially from being in a regular classroom; that she has progressed through school with these same children, some of whom have become her friends. Although this may be desirable, it is not a factor under the IDEA. The district is obligated to integrate her with non-disabled students so that she may be exposed to language and behavior models, not necessarily with her friends.

from the teacher that it detracts from the other students? This is more problematic. Because Beth is on a separate curriculum from the other students, the classroom teacher cannot work with her and with the rest of the class simultaneously. This is particularly so in middle school, where teachers tend to use a lecture format and the classes are only 42 minutes long. The teacher cannot spend time working with Beth on her separate lessons without neglecting the other students. Any time the teacher does spend with Beth is taken away from the rest of the class.

Having determined that Beth cannot be satisfactorily educated in regular education, we turn to the second prong of the Daniel R.R. test. The district's proposal also mainstreams Beth to the maximum extent possible. It includes "reverse mainstreaming," where non-handicapped students are brought into the special education classroom to interact with the special education students, and also integrates her at lunch and other non-academic activities, such as art, music, lunch and field trips. These opportunities will allow Beth the non-educational benefits discussed above, such as modeling other students and motivating her to communicate. But putting Beth in a regular classroom for academic subjects, as we have repeatedly emphasized, would not benefit her.

Considering all these factors, we agree with the IHO that regular education will not satisfactorily benefit Beth. The school has made ample attempts to accommodate her, but her condition requires changes that make the curriculum unrecognizable. She will not benefit academically from the regular curriculum, and non-educational benefits will be limited. She will also compete for the teachers' attention, detracting from the other students. Placing Beth in a regular classroom provides nothing but the chance to associate with non-disabled students.

*See* <u>Daniel R.R.</u>, 874 F.2d at 1050. The statutory presumption for mainstreaming is overcome.

## 2. The Roncker Test

First, we consider what makes the ELS program superior. Quite simply, it provides Beth with more direct contact with teachers, and teachers who are trained and experienced in dealing with cognitive disabilities. In either placement, Beth has an aide with her at all times. But this is not a substitute for contact with the teacher. Here, she can receive one-on-one contact without detracting from other students. Morever, the ELS teachers are specially trained to deal with children who have cognitive disabilities. The administrator who runs ELS has worked with four Rett Syndrome students, and there is currently one other such girl in the program. Although the district can certainly train Beth's teachers about Rett Syndrome and how to use Beth's assistive technology, this does not equate to the training and experience of a special education teacher. Special education is also more conducive to systematic instruction. Rather than attempting to keep pace, even in modified form, with her non-disabled classmates' lessons, Beth can repeat skills until she learns them. The district's professional educators believe this is the most effective way for girls with Rett Syndrome to learn, and judges should not second-guess them on educational methodology. Another advantage is that in ELS, Beth would not have to move classrooms every period. Because of her restricted mobility and special equipment, this takes her much longer than the three minutes allotted between classes in the regular middle school, reducing the time available for instruction. Finally, ELS allows the school to incorporate physical therapy into Beth's program. This is essential to help her maintain her mobility as her Rett Sydrome progresses.

Turning to the second prong of the test, these advantages cannot be feasibly duplicated

in a regular education setting. The classroom teacher would have to develop two distinct lesson plans, one for Beth and another for the rest of the class. Any time spent working with Beth would be time taken away from the other students' instruction. The school would have to assign a second teacher to the classroom specifically to deal with Beth, which brings us back to the scenario of segregated special education within a regular classroom. It is one thing to modify the curriculum to accommodate the disabled student, to provide supplemental support, or to emphasize the simpler skills, but Beth will gain nothing from listening to a middle school lecture. She uses unrelated materials and is working on a completely different skill set.

The rest of the class cannot wait for Beth to master a particular skill before moving on to another lesson. Beth could not keep pace with the class under any circumstances; she would also miss time each period for private therapy, physical therapy, additional absences and setting up her equipment. The need to "move on" to the next unit with the class makes it impossible to use the systematic approach. Under this standard, as well, special education is the more appropriate placement for Beth.

Ultimately, this is not really a choice between regular and special education, but between two forms of special education. Although Beth currently sits in a regular classroom, she is effectively segregated from the other children. Her cognitive limitations do not allow her to participate in the regular instruction – an aide works with her one-on-one and the lessons are completely different. Beth does not receive a modified curriculum, but a parallel one. She will have no meaningful interaction with her non-disabled peers during academic classes. This is not mainstreaming in any real sense, but special education in a regular classroom. Consequently, we must conclude that the IHO was correct in his finding that it is not a viable,

less restrictive placement for Beth. In part, this is also a methodological dispute. The district and its experts believe in a systematic approach to educating Beth, focusing on repetition. Beth's parents and their experts believe a language-rich environment is more important. This is a pedagogical decision, not a legal one. It is better left to the educators, not to the courts.

## III.  Reimbursement for Private Therapy

If a school district fails to provide an FAPE, a parent may, under certain circumstances, unilaterally secure the necessary services and seek reimbursement. This is not one of those cases. The district already paid for an independent evaluation by Dr. Vaal. It does not need to pay for another evaluation. Defendants have provided a program which satisfies the IDEA, *i.e.*, is reasonably calculated to confer educational benefit. It is not required to pay for Beth's private therapy as well.

## IV.  ADA and §504 Claims

Although these claims are not identical, they both require proof of intentional discrimination or failure to provide the most reasonable modifications. *See* Washington v. Indiana High School Athletic Ass'n, 181 F.3d 840 (7th Cir. 1999). It is not enough to show that the district made an improper placement, or that the attempted accommodations proved inadequate. These are not "educational malpractice" claims. Smith v. Special School District No. 1, 184 F.3d 764, 769 (8th Cir. 1999). There must be "gross misjudgment or bad faith on the part of school officials." *Id.*

There is no such proof here. Instructing district officials to maintain records in anticipation of a due process hearing does not equal bad faith. Plaintiff may quarrel with the district's placement decision, but there is no evidence that the district was trying to segregate

Beth because of animus towards the disabled. To the contrary, it is apparent district officials believed, in good faith, that ELS would provide the best education for Beth. And although the district may not have cooperated with Beth's parents and private therapists to the degree that they would have liked, there was no conspiracy to make Beth fail. In short, there is no evidence of intentional discrimination here.

## CONCLUSION

For the reasons above, judgment is granted in favor of defendants on all counts.

JAMES B. MORAN
Senior Judge, U. S. District Court

Sept. 10 , 2001.